Our first case today is United States ex-rel Yarberry against Supervalu Incorporated. And we'll hear first from Mr. Ascheman. Thank you, Your Honor. I may have pleased the court. Good morning, Your Honors. I'm Dale Ascheman on behalf of the Relator Appellants, Mr. Schutte and Mr. Yarberry. The District Court's summary judgment decision should be reversed and remanded for any one of the following three reasons. The District Court erred in granting summary judgment by failing to construe the facts in favor of the Relators as a non-moving party. The District Court erred in applying safe-going Purcell to the facts of this case. And the District Court erred in applying three separate FCA scienter standards by finding that reckless disregard subsumed actual knowledge and deliberate ignorance. Now, sorry, my computer's hung up, Your Honor. With respect to failing to construe facts in favor of the non-moving party, the principle dispute of material fact concerns the nature and character of Supervalu's price-match program. Relators have maintained that its price-matches were programmatic. Supervalu, instead, has maintained that they were infrequent individual negotiations. Supervalu maintains, basically, that UC price is a sticker price, and its price-matches, however common, widespread, or readily available, don't constitute discounts under any contract or regulation. The District Court appears to have agreed with Supervalu. The foundation of the Court's current Safe Coast opinion is its adoption of defendants' characterization of their program as individualized price-matching. That finding is irreconcilable with the Court's previous falsity opinion, finding that Supervalu offered a nationally-advertised discount program, and that the discounts offered were not one-time lower cash prices, but offered over multiple benefit years. The Court's more recent... Mr. Ashworth, would it really matter, even if that were the case? Because it seems like that particular issue is directly relevant to what you did win on after Garbay. But regardless of the nature of the discount program here, the question comes down to, under SafeCo, was there any... Was the defendant's construction objectively reasonable? Was there any type of authoritative guidance out there? So, whether this is a programmatic or an infrequent occurrence, does it really matter for purposes of construing objective reasonableness? Well, to the extent, Your Honor, that the Court accepted the characterization of Supervalu in the face of a contract, a PBM contract with Medco in particular, that specifically entailed a definition of usual and customary that included competitor price matching. But would that... That's a contract, not authoritative guidance. So, would that really matter? Well, Your Honor, there's a federal regulation at issue here. It's 42 CFR 423.505. And that's required to be a part of every... It's required sponsors and all of its downstream entities to be contained inside of their contracts. And that includes downstream entities like the retail pharmacy Supervalu in this case. Those contracts are not optional folly. They must be followed. And within that... And I'm not suggesting they wouldn't. They don't have to be followed. And maybe there's a different breach of contract or some type of cause of action for that. But you're suggesting that because of that one PBM contract, that the underlying factual description of the program at issue would matter. And my question to you was, how is this authoritative guidance, which the Supreme Court and SAFCO said is what matters for the objective reasonableness determination? Well, let me address the objectively reasonable aspect of your question then, Your Honor. Well, there's really a part that would be great if you could address. The objective reasonable and what links into that, please, is the authoritative guidance. Yes, Your Honor. Well, I'll take the objectively reasonable aspect first and try to explain where the authoritative guidance follows. So, supervised objectively reasonable interpretation of the UNC price term is patently unreasonable. By supervised interpretation, you see price as a sticker price that needn't reflect price match discounts. For a multitude of reasons, actually, supervised failed to articulate any objectively reasonable interpretation. First, as I mentioned, 42 CFR 423.505, it's a federal regulation that's required to be part of their Part D contracts. That regulation requires compliance with all applicable Medicare guidance and instruction. This federal regulation is present, in fact, in every PBM contract that Supervalue has, that Supervalue has executed. Those must comply provisions are contained in Addendum B to the short appendix that we filed, so the court has that. But the supposed reasonable interpretations that Supervalue offers consists of sources that are either entirely irrelevant to Part D or inapplicable to the subject matter. So, for instance, Supervalue bases its reasonable interpretation of UNC on Part A hospital discounts, Part B billing of laboratory tests. There's a cover letter to the GAO, which actually predates Medicare Part D. And in virtually all of the contracts, if not most, I can say safely, most of the contracts that Supervalue executed contain a UNC definition that entails, including discounts, available discounts, any discounts, applicable discounts, and the cover letter that they offer actually refers to a definition as UNC as an undiscounted price. Now, that is, there's no basis to say it's reasonable to rely on a GAO cover letter from 2004 defining UNC as an undiscounted price when that is directly contrary to the express language of the PBM contracts. There are PBM contracts that say otherwise. I believe it was the express scripts contract that expressly excluded a competitor's matched price. So, it seems like you have them on both sides. But again, I come back to you're relying on PBM contracts. Is that authoritative guidance? By federal regulation, it is, Your Honor. I mean, they've, these defendants voluntarily contracted with the plan sponsors to provide a benefit at the direction of CMS. It's not, it's not- That's what, counsel, I thought you were relying on the 2006 CMS guidance that played a role in the Kmart case. Well, that's certainly, absolutely, Your Honor. That's the lower cash price policy, which was initially issued in October of 2006. It is essentially the benchmark for how usual and customary should be calculated by retail pharmacies. Is it correct to say, look, the debate here about what's usual and customary and whether there's ambiguity reminds me of the need usually to look at ambiguity as applied. On the, you know, on one hand, we've got, we've got the defense saying that the, that the relator is arguing that two sales of a prescription within three months or something like that, and according to your theory, are enough to make that usual and customary. That seems pretty improbable. On the other hand, you're saying that vast, the vast majority of the highest volume drugs are sold at the discounted price systematically and repeatedly, and that sounds pretty usual and customary to me. So, I guess I'm, what I'm trying to figure out is, is how best to quantify this practice and whether that can be resolved on summary judgment. Well, Your Honor, the two, the two sales in a three-month period, the defendant has cast that as somehow being a, an indicator of liability, and that's just not the case. The two sales in three, in a three-month period is simply evidence of the offer being accepted, and the, this, that's strictly a damage model, and the reason for the two sales is because we wanted to avoid the idea of that example listed in the lower cash policy of the one-time, for instance, the one-time price match, the one-time offering that CMS has blessed as saying that's okay. So, we wanted to avoid that, and in terms of, we do not believe that usual and customary requires any particular number. For instance, a majority-type argument, of course, you know, that manifests, obviously, that a lot of discounts are being given, but the real issue here is, is there an offer to the general public? That's the trigger for liability. Is it widely and consistently available? And, you know, even as the early CMS guidance indicates, does a beneficiary, does a beneficiary have access to this discount at any point in the that, that's, that actually describes a price match. So, where the defendant says that there's no specific price, we didn't have a discount formulary, so we're different, we're not like Walmart, that's just not the inquiry. The inquiry is that this price, the lower discount prices were always available over multiple benefit years, and, you know, there's just, there's simply no prices are programmatic. The fact is, it was programmatic because these prices were always available. I thought, and I thought your position also was that, I'd like to get your thoughts on the customer initiation, which seems to be the focus of much of the defense briefing, but I'd like to get your thoughts on the, the evidence concerning the repeat applications of discounts once a customer has asked. Sure. And I thought, is it, is it correct that it, and we've got, we've got different things going on at different times here, but I thought that there were times, at least several years, where pharmacists were being told that they must raise this issue with customers. That's absolutely correct, your honor. From 2006 until mid-2012, the pharmacists were required to mention the price match guarantee to beneficiaries coming in, to anybody coming in, that's particular cash customers. Now, the court mentioned the customer ask requirement. In January of 2012, the defendants were served with an HHS-OIG subpoena. Up until that time, the lower cash, or excuse me, the prescription pricing policy of SuperValue did not require, there was nothing about a customer ask requirement. It was only after that subpoena issue that SuperValue changed its official pricing policy to incorporate a customer ask or a customer initiation requirement. Okay. Could you address more specifically how you view the different parts of the statute's knowledge requirement and their interaction with Safeco? I think that that seems to be one of the principal legal debates here about whether actual knowledge and deliberate ignorance are necessarily subsets of reckless disregard. Well, the quick answer, your honor, is that the surplusage principle of statutory interpretation is that you can't have language in a statute that has no meaning. Reckless disregard is obviously the stated standard by all the courts that have applied Safeco and its progeny in the Safeco context. That addresses the objective aspect of a defendant's state of mind, whereas deliberate ignorance and reckless and actual knowledge address the subjective knowledge of the defendant. Problematically, Safeco, if not applied narrowly to an actual ambiguity, has the effect of hermetically sealing defendants from ever having to face their subjective bad faith. But I would certainly say that- Is it your argument, then, that every other circuit court that has found that Safeco applies in the FCA context is limited to the deliberate indifference only? I mean, reckless disregard only? That appears to be what the precedent suggests, your honor, because the objectively reasonable interpretation of an ambiguity is to be looked at objectively. Now, there's at least an argument- How would you have actual knowledge, Mr. Ashman, if there is an objectively reasonable interpretation of the statute? Well, your honor, it's a really good question and almost a riddle, because if you look at the definition of reckless disregard, as this court has defined it in the King-Bassel case, it was an actor knows or has reason to know facts that would lead a reasonable person to realize that in the shoes of the individual, knowing what they know, is it reasonable. But problematically, in, for instance, the Purcell case, you know, the court said that even the lowest standard, in its words, was problematic when falsity turns on a disputed interpretive question. And so, it's difficult to say that if you're applying safe co-precedent strictly that you even get to the real gist of what reckless disregard is. And I apologize, your honors, but I've got about a little under four minutes. I need to reserve my time for a rebuttal. If you need an apology, that's fine. Thank you very much. We'll now turn to Mr. Quinn for the defendants. Thank you, Judge Hamilton. May it please the court, John O'Quinn, on behalf of the defendants. The issue in this appeal is how to interpret and apply the scienter standard of the False Claims Act, a requirement that, as the Supreme Court held in Escobar, must be, quote, strictly enforced, end quote, to ensure due process and fair notice in the application of that punitive statute. Now, in this case, as the discussion has shown, the alleged falsity at issue turns on the interpretation of a disputed legal question. And so, the question that you were just asking, Judge St. Eve, it would be almost metaphysical to say that somebody can know that they are acting in violation of an ambiguous statute. And that's a point that the Supreme Court recognized in Safeco, the D.C. Circuit recognized in Purcell. And indeed, in Purcell, the D.C. Circuit, at page 290 of that decision, in the face of testimony from the defendants' employees, that the defendants, quote, knew they were applying the wrong definition, end quote, found that that was irrelevant because the inquiry was an objective one. And that was consistent with the Supreme Court's recognition that there shouldn't be liability if there was conduct consistent with an interpretation, quote, could reasonably have found support in the courts, whatever their subjective intent may have been. Isn't that also consistent with our opinion in Van Straten, even though that wasn't a false claims act case? It absolutely is, Judge St. Eve. I mean, there, this court recognized that Safeco's inquiry, quote, concerns objective reasonableness, not anyone's state of mind, end quote, page 490 of the Van Straten opinion. And I think it's also consistent with another line of cases in which this court has found that there can be no false claims act liability over disputes of differences of interpretation of legal questions. This court held that in Iannacopolis that the false claims act does not impose liability for, quote, a disputed legal question. And it reached the same conclusion in Marshall versus Woodward, Lammers versus Green Bay, and Sheetmetal versus Horning as well. All of those cases are supportive of exactly what the district court concluded here. And indeed, consistent with the court. Under the false claims act, what role do the provisions for actual knowledge and deliberate ignorance play? Well, Judge Hamilton, I think this court recognized in King-Vassil that reckless disregard is the most capacious of the three scienter standards. And the other two, I think, do fall within it. So your theory then is that they serve no purpose? Well, respectfully, Judge Hamilton, I think that they are recognized common law standards. The court of, excuse me, the Supreme Court in Escobar recognized that except where expressly stated different, for example, in the context of having to have a certain type of specific intent, that the false claims act codified the common law. And under the common law, yes, one is broader than and subsumes the other, but to be sure there are different ways of proving one. But that doesn't mean that you can bring in somebody's subjective belief about what a statute would mean or in this case, a regulatory obligation would mean and get a different result than what was at issue in Safeco. And indeed, I think the Supreme Court took that head on in footnote 20 of the Safeco opinion where it noted that both knowledge and recklessness were at issue and it's holding applied as, as to both. And so if the question is, is the language of the statute doing any work? I think it recognizes, you know, time-tested common law ways of showing scienter, but that doesn't mean that one is not subsumed within the others necessarily. So would you never have liability for actual knowledge if there's an objectively reasonable interpretation of the statute that you're following? Well, I think that would, Judge St. Eve, comes to whether or not there's authoritative guidance that warns away. Think of it as sort of a Chevron type inquiry. There might be multiple reasonable interpretations once there is authoritative decision. For example, the Supreme Court identified the decision of a court of appeals as being such an authoritative decision. At that was otherwise objectively reasonable, you've, you've been warned away. And Judge Hamilton, coming back to your question, if I may, the issue that we're dealing with here is, is the scienter standard where the issue is a disputed legal obligation, not talking about whether there are issues of disputed facts. And this court, of course, recognized in Yanacopoulos that there is a difference between interpretive questions and questions of historical fact. It may very well be that regardless of whether or not recklessness would apply, if somebody had subjective knowledge of a historical fact, that would present a different question. But that's not the issue that's presented here, nor was it the issue in Safeco. A couple of questions. One, do you believe you need to come up with, do you have any evidence, and do you think you need evidence of actual reliance at the relevant time on the interpretation that you're advocating now of the definition of usual and customary? Yeah, so the short answer is no, I don't believe that the inquiry requires that there be reliance of the... Do you have any such evidence? Well, I'll flip it the other way, Judge Hamilton. I don't think that there's any evidence... Please answer the question, Mr. O'Quinn, the way I asked it. Do you have evidence of actual reliance at the relevant times on the interpretation you're advocating now? Well, Judge Hamilton, I believe that the evidence shows that SuperValue did not believe that its price matching was affecting its usual and customary price. If the question you're asking is, do I have evidence that they relied on a particular GAO report or anything along those lines, I don't. But I can give you a couple of concrete examples where SuperValue had before it evidence from Caremark, one of the largest PBMs back in 2011, specifically asked whether or not price matching would require a change in its usual and customary price. This is an R-174-25, and Caremark responded that price matches wouldn't conflict with the UNC price, didn't require a change. Similarly, there were inquiries to two Medicare commissions, both the state of Oregon and the state of Iowa. And the question with respect to those is, in essence, how did you describe the program? And we'll need to look at that to the extent it's relevant. The next set of questions I guess I wanted to get your input on was the evidence from Relator to the effect that, I think the way they put it, out of the top 50 in volume drugs, 44 were sold at lower prices than you reported a majority of the time, and 30, more than 80% of the time. Do you have a response to that evidence factually to eliminate some dispute? And how is that kind of practice consistent with any reasonable definition of usual and customary? Yeah, so Judge Hamilton, first, I don't think that whether or not it was usual and customary turns on the frequency of price matching. I would think that that's pretty evident in usual and customary. Well, respectfully, Judge Hamilton, I think there are multiple parts to this. One is, what is your usual and customary price? Second is, who is the general public? And I understand that this court in Garvey addressed the issue of who is and who isn't the general public, but certainly prior to Garvey, it certainly would have been, at least objectively, reasonable to think that somebody who has to undertake some sort of voluntary action in order to opt in or to obtain a special benefit is not part of the general public. How does that fit in with the evidence that your pharmacists were instructed to tell every cash customer, we have this price match policy? Yeah, I know. I'm glad you raised that, Judge Hamilton. It was a point that I wanted to come back to because that is not what the evidence that my colleague on the other side shows. What he's relying on is the 2009 prescription pricing policy. It's in the record in several places, including R-166-3 and R-174-2. And if you look at that policy, what it says is that if a customer raises customer price concerns, so the customer has to say something. If somebody comes in and offers and asks to buy something at the cash price, they're going to be charged the usual and customary price. They're not going to get a discount. It wasn't automatic. And that also goes to why I think it's objectively reasonable that even if price it still doesn't change the usual and customary price because it isn't the price that someone would automatically. But what happens is that if after quoting the price, the customer claims to have filled the prescription for a lower price, you ask for the competitor name, you confirm the price. And it specifically says, quote, for all customer price inquiries, mention service, convenience, and price match guarantee. So it's only in response to the customer initiating a customer price inquiry that this is raised. Now, it's certainly true that in the 2012 policy, that was changed. And for customer price inquiries, it just says, mention service and convenience. But the idea that anyone who comes in who's paying cash is going to under the policy. And to come back to the first part of your question, Judge Hamilton, it's not disputed that in total over the 11 years at issue, only 26.6% of total cash transactions involved overrides. Now, not every override was a price match, but let's just assume it was less than that. But let's just assume they were to make it easy for present purposes. So nearly three quarters of all of the cash transactions for these prescription drugs did not involve price matches. And in fact, if you look, and you don't... That is surely one of the best facts for your side. And could you, but what about the 30 drugs where 80% of the prices were with price matches? Well, a couple of points in response to that. And one is, if I may, just, if you even look at a per year basis, and you can see this at R188-3, page seven, table four. If you don't start cherry picking among the drugs, if you look at all of the drugs, there's not even a given year in which price matching occurred a majority of the time. Now, with respect to certain drugs... Wait a second. Okay, this is a level of detail that's going beyond what I know. Are you saying that Mr. Ashman's facts are wrong on the 30 and 44 out of the top 50? No, Judge Hamilton, I'm sorry. I apologize for the confusion. The point that I was just simply is that, again, overall, and I'm going to turn specifically to the ones that they've cherry picked in a moment. But for overall, it's 26.6% for the 11 years in question. And overall, for any year, it's not a majority. That's significant among other reasons. If you look, for example, at the Madison versus Mississippi Medicaid Commission case, where it discussed discount prices, and it gave the example of discounts and which ones would and which ones wouldn't be counted. And it said it wouldn't be counted unless the patients receiving the favorable prices represent more than 50% of the store's prescription volume. That was looking overall at the entire store's prescription volume. And similarly, if you look at the guidance that was... Presumably, claims are made on a per-drug, per-prescription basis, right? Well, that's right. They're submitted ultimately on a per-prescription basis. But I think it's telling that when you look at the response from Caremark, from Oregon, from Idaho, from... And also in declarations from Express Scripts, Optum, Argus, MedImpact, that none of them suggested that ultimately, that it turned on the frequency of price matching. They recognize that if you're matching... Did you tell any of them that you were selling these drugs 80% of the time at lower prices than you were charging them? Well, Judge Hamilton, I don't know what was but I know this. Number one, they had the unfettered right to investigate, to audit, and ultimately to even assert a claim, for example, for breach of contract. I mean, this gets to the point, Judge St. Eve, you were alluding to in one of your questions. The position here, it goes to the difference, of course, between falsity and scienter. And I do want to come back to the falsity-scienter distinction because the relators are trying to have it both ways. They want to look at a blunderbuss approach for purposes of falsity, and then they want to take it drug by drug for purposes of scienter. And to the extent, obviously, we think the court can and should affirm, because scienter is different from falsity. And it may very well be, Judge Hamilton, that it turns out that under the better interpretation of the regs, that the true price for some of these drugs was the price-matched price. But that doesn't answer the question vis-a-vis scienter. But if you disagree and think that there should be some slicing and dicing that should take place, respectfully, that should happen not just on the issue of scienter, but on the issue of falsity. I mean, my colleague on the other side is right to say that the two matches in three months in a given state was their damages theory. That's because their liability theory was even worse. If you look, for example, at R-161, page 4. Sorry, go ahead with that site. Yeah, R-161, page 4, and R-164, page 11. They specifically say that the frequency doesn't matter. It would be enough if there was no price matching. It was enough that you were offering to do price matching to change the usual and customary price for drugs. One of the interesting arguments, Mr. Quinn, that you all made was that because this court took Kmart on a 1292B petition, that necessarily meant there were reasonable grounds for disagreement on the meaning of usual and customary, right? Well, I think the fact that the court granted a 1292 does suggest that there were the district court's opinion in that case. Did you check the 1292B petition in the Kmart case to see what we said were subject to that reasonable dispute? Well, Judge Hamilton, as I think we pointed out, that particular question wasn't in the petition. It was a question this court had added. It was a fourth question that this court added, which I think, if it was certainly subject to reasonable dispute because the court, sua sponte, thought that it was worth looking at the question of what constituted usual and customary price. Now, the case doesn't turn on and indeed doesn't resolve the question vis-a-vis price matching, but in terms of what actually potentially constitutes usual and customary price, I think that the fact that the court took the question certainly suggests that there could be differing views. Mr. Quinn, I want to go back to the authoritative guidance question. The D.C. Circuit in Purcell has parsed this into kind of a three-part test. One is the statute ambiguous? Two, was it objectively reasonable to have a certain interpretation? And then three, was there any authoritative guidance that warned them otherwise? Do you agree with this three-part test? And my second question is, on the third prong, the D.C. Circuit has said that the warning question is a question of fact as opposed to a question of law. You didn't fully embrace that in your response brief. If you could address that question, please. Sure, Judge St. Eve. So, I think as a general proposition, that three-part test, which I think some other courts, the Third Circuit in Streck v. Allergan, I think, articulated that way. And if I may, I would point out the Streck v. Allergan case. I think it's very analogous to the situation here where there was a dispute over price and what discounts or credits counted or didn't. I don't think the Third Circuit, though, agreed that there was a question of fact on the warrant or necessarily took that on. I don't think that it did either. And I'm not sure that there actually is a question of fact that is presented in the third part. But to the extent it is, Judge St. Eve, I think the question of fact goes to whether or not you knew or should have known of the authoritative guidance, not whether or not there was authoritative guidance. It seems like whether there is authoritative guidance, by definition, has to be a legal question. Whether you knew or should have known of the authoritative guidance could potentially be a fact question. But the dispute that we're having here is whether there is anything that would even constitute the kind of authoritative guidance that was contemplated in Safeco and in Purcell. I see my time is up. I'm happy to answer any additional questions. If there are none, one final point, Judge Hamilton, with respect to some of the individual drugs, and that is this. You potentially find yourself in a situation of having to slice and dice and ask, well, is it unreasonable if you match all prices on a given day? Is it on a given week, a given year, a given decade? What if the price matches are not always the same? Maybe you matched a $4, maybe it was an $8. Which one is it becomes your usual and customary, as opposed to it being objectively reasonable to think, number one, that matching someone else's price is not changing your own price, and number two, that treating and honoring an individual's request for an exception is not the same as what you would charge the general public if they came in and the transaction proceeded automatically. The court has no questions. I appreciate the court's time. Thank you, Mr. O'Quinn. Rebuttal, Mr. Asherman. Yes, Your Honor. Well, first off, going back to the idea that this customer ask requirement, SuperValue, it's of record, SuperValue had signs all over the inside of its pharmacies saying, ask us about our price match. The degree of advertising that went on for these cash discounts can't be underestimated. The counsel referenced what Caremark representatives told him, what Oregon and Iowa said. None of that should matter in this inquiry. They should be bound by the reasonable, objective interpretations that they stated in their briefs, and they're bound by that. Their stated beliefs were Part A, Part B, GAO cover letters that predated Medicare. In terms of the automatic nature of the price matches that were given, once a beneficiary received a price match, price matches for that individual basically went on autopilot. The auto refill program automatically propagated the price for that drug for that individual going forward. That was limited to a particular drug, correct? Yes, Your Honor. So the price match would occur with respect to, not the individual, but the particular drug for that individual? That's correct, Your Honor. So if they had 10 drugs and there was one that was price matched, they wouldn't automatically get a price match on the other nine drugs? That's right, Your Honor. Whatever the original price match was, that would carry forward. Now, counsel was talking about their authoritative guidance, and this question is a little bit blended because part of their explanation for their objectively reasonable interpretation is that they could disregard the CMS manual. That on its face, according to federal regulation and its contract, the idea that the CMS manual is not authoritative, there's just simply no basis for that. It's just completely false. Over the decade that this price match program went on, SuperValue offered some 6.3 million price matches, override prices. At its peak, that was 18,000 times per week. This was programmatic. It was widespread. It was heavily advertised. All the banners participated. These were not random individual pharmacists haggling in individual negotiations with customers. This was a concerted and focused corporate strategy to increase foot traffic and retain profit margins. Mr. Ashman, I want to go back to the CMS guidance in the manual. What impact should it have that the language you've identified about price matching was removed from the manual in 2013? Your Honor, it was removed in 2013 because initially the idea of the lower cash price policy entailed a donut hole. That is where a beneficiary moves through to catastrophic coverage. It allowed beneficiaries to avail themselves of lower prices. But the need for that simply disappeared with Obamacare. They got rid of the donut hole, and the guidance that went from a excuse me, in the benefits manual was no longer necessary. Now, if I may, I see I'm out of time, but Your Honor, we're here on this appeal because SuperValue convinced the district court that this court, the Seventh Circuit, changed the rules of the game and created law with the Garvey opinion. That's just simply nonsense. The most recent authority cited in Garvey was from 2006. This court can make quick work of this appeal by simplifying that Garvey said nothing new, and there's no place for Safeco here. Thank you, Your Honors. All right. Our thanks to both counsel. The case is taken under advisement.